UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAW OFFICE OF YURIY PRAKHIN, P.C. and YURIY PRAKHIN,

                       Plaintiff,

        -against-

YELENA RUDERMAN, FARUQI & FARUQI, LLP, INNESSA M. HUOT, ESQ., ALEX J. HARTZBAND, ESQ., CAMILO M. BURR, ESQ., TILTON BELDNER LLP, JOSHUA S. BELDNER, ESQ., and JOHN DOES 1-10,

                       Defendants.
------------------------------------------------------------------------X

Civil Action No.

**<u>COMPLAINT</u>**

Plaintiffs, LAW OFFICE OF YURIY PRAKHIN, P.C. and YURIY PRAKHIN, by and through their attorneys, LAW OFFICE OF YURIY PRAKHIN, P.C., as and for a Complaint herein, respectively sets forth and brings this action against Defendants, YELENA RUDERMAN, FARUQI & FARUQI, LLP, INNESSA M. HUOT, ESQ., ALEX J. HARTZBAND, ESQ., CAMILO M. BURR, ESQ., TILTON BELDNER LLP, JOSHUA S. BELDNER, ESQ., and JOHN DOES 1-10, for damages, and alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.     This is an action in equity under Federal Rule of Civil Procedure 60(d)(1) and 60(d)(3), and, in the alternative, common-law fraud and fraudulent-concealment action, arising from a scheme by Defendant Yelena Ruderman and her litigation counsel in the underlying federal action, Ruderman v. Law Office of Yuriy Prakhin, P.C., et al., No. 19-cv-02987-CBA-LB (the "Underlying Action"), to obtain and preserve a judgment through incomplete medical-record production, false representations that the production of medical records was complete, and eve of trial and during-trial document dumps of central provider records.

2.      The theory of this action is that the Court, the jury, and Plaintiffs were deprived of a complete and truthful record by representations from the plaintiff and her counsel in the Underlying Action that caused the Underlying Action to be tried and decided on a materially distorted evidentiary record.

3.      The core misconduct was not merely late supplementation. The record now shows a repeated pattern: only approximately 6.6% of Dr. Cinthi Pillai's records were timely produced; only approximately 7.6% of Dr. Anna Shostak's records were timely produced; and only approximately 3.8% of Dr. Martin Falk's materials were timely produced. In addition, Plaintiffs are aware of no timely exchanged provider file for Dr. Jeffrey G. Odel, who was listed/planned as a medical witness and was tied to Ruderman's genetic-testing/LHON narrative, or for Drs. Dedania, Brodie, and Moster, who were also identified as medical witnesses or providers.

4.      What enabled this concealment was that Ruderman controlled production of her own medical records and falsely represented that she had fully satisfied discovery obligations and produced all relevant medical records, when she had produced almost none of the relevant records.

5.      In May 2020, Ruderman certified under penalty of perjury that she had received and produced all medical records relating to her disability and emotional distress.

6.      That certification and related representations became the substitute for independent provider discovery produced pursuant to HIPAA authorizations.

7.      The later record shows that the certification was materially false.

8.      This false representation was part of scheme to withhold years of treatment records showing Ruderman's extensive and severe pre-existing psychological issues and the fact that she had been blind in one eye since childhood, when he falsely claimed she did not have any

2

vision issues until the onset of the issues that gave rise to the Underlying Action.

9. Furthermore, a newly clarified and expanded evidentiary record now shows that an alleged discovery "agreement" to limit medical records to only after when her employment with the Law Office of Yuriy Prakhin, P.C. concluded was a fabrication that was never established by a signed stipulation, clear written agreement, court order, or on-the-record statement.

10. During the February 13, 2023 trial colloquy, Ruderman's counsel asserted the existence of this agreement, which defense counsel immediately controverted it, and Judge Amon expressly stated that she did not know whether the asserted agreement was accurate or "who agreed on what."

11. Former defense counsel Edgar Rivera later directly controverted Plaintiff counsel's characterization of any such agreement in a sworn declaration.

12. The newly discovered billing records do not identify any negotiation, confirmation, or execution of such a discovery-limiting agreement, and the nine-page alleged memorialization did not clearly mention document a June 2018 limitation. Yet the alleged agreement was used to avoid HIPAA authorizations, defeat independent provider discovery, and justify Ruderman-controlled production as complete.

13. The fraudulent scheme also corrupted the merits of liability and damages. Because the underlying discovery was incomplete and strategically delayed, Plaintiffs could not retain or present the ophthalmological, low-vision/vocational, and forensic mental-health experts whose opinions are now available from Dr. Carolyn R. Carman, Neva Fairchild, and Dr. Bill D. Geis. Those experts explain that Ruderman's trial narrative concerning her vision, psychiatric condition, functional capacity, and damages was materially false.

14.    The jury therefore heard a trial narrative built on concealed records and falsehoods, including alleged direct misrepresentations and omissions concerning Ruderman's preexisting vision limitations, longstanding psychiatric history, functional capacity, emotional-distress causation, and damages.

## PARTIES

15.    Plaintiff, Law Office of Yuriy Prakhin, P.C., is a New York professional corporation with its principal place of business in Brooklyn, New York. It was a defendant in the Underlying Action.

16.    Plaintiff, Yuriy Prakhin, is an individual residing in New York. He was a defendant in the Underlying Action in both his individual and professional capacities.

17.    Defendant, Yelena Ruderman, is an individual residing in New York. She was the plaintiff in the Underlying Action and the party who obtained the judgment that is the subject of this action.

18.    Defendant, Faruqi & Faruqi, LLP is a law firm that represented Ruderman in the Underlying Action.

19.    Defendant, Innessa M. Huot, Esq., was counsel of record for Ruderman in the Underlying Action and made discovery, trial, and post-trial representations concerning medical-record production, provider records, and the alleged discovery agreement.

20.    Defendant Alex J. Hartzband, Esq. was counsel of record for Ruderman in the Underlying Action. Plaintiffs allege upon information and belief that he participated in the litigation, trial preparation, provider communications, discovery responses, and/or attorney-fee submissions relevant to this action.

21.    Defendant Camilo M. Burr, Esq. was counsel of record for Ruderman in the

Underlying Action. Plaintiffs allege upon information and belief that he participated in the litigation and trial proceedings relevant to this action.

22.    Defendant Tilton Beldner LLP represented Ruderman in the Underlying Action, including trial-related proceedings and attorney-fee submissions.

23.    Defendant Joshua S. Beldner, Esq. represented Ruderman in the Underlying Action and participated in trial, witness preparation, provider communications, and/or related submissions.

24.    John Does 1-10 are persons or entities whose identities are presently unknown and who participated in, aided, ratified, or benefited from the misconduct alleged herein. Plaintiffs reserve the right to amend after discovery.

**JURISDICTION AND VENUE**

25.    This Court has jurisdiction over Count I because this is an action in equity seeking relief from a judgment entered by this Court in the Underlying Action, pursuant to Federal Rule of Civil Procedure 60(d)(1), Rule 60(d)(3), and the Court's inherent and ancillary jurisdiction to protect the integrity of its judgments.

26.    This Court also has jurisdiction because the Underlying Action arose under federal law, including the Americans with Disabilities Act, and the requested equitable relief concerns a federal judgment entered in that federal action.

27.    This Court has supplemental jurisdiction over the alternative state-law fraud and fraudulent-concealment claims under 28 U.S.C. § 1367, because those claims arise from the same nucleus of operative facts as the Rule 60(d) independent action.

28.    Venue is proper in this District because the Underlying Action was filed, litigated, tried, and reduced to judgment in the Eastern District of New York; the alleged fraud occurred in

5

proceedings before this Court; and material events occurred in this District.

29.    This action is related to Ruderman v. Law Office of Yuriy Prakhin, P.C., et al., No. 19-cv-02987-CBA-LB.

## THE UNDERLYING ACTION

30.    Ruderman commenced the Underlying Action against Plaintiffs alleging disability discrimination and failure to accommodate under federal, state, and city law. Ruderman claimed that her visual condition, later diagnosed as Leber Hereditary Optic Neuropathy ("LHON"), rendered her legally blind and that Plaintiffs unlawfully terminated her and failed to accommodate her.

31.    Ruderman sought damages including back pay, front pay, emotional-distress damages, and punitive damages. Her medical condition, functional capacity, psychiatric history, emotional-distress causation, and claimed inability to work were central issues.

32.    On February 16, 2023, after a jury trial, the jury returned a verdict in favor of Ruderman and awarded damages totaling $1,735,000, including back pay, front pay, emotional-distress damages, and punitive damages.

33.    Plaintiffs filed post-trial motions, including motions under Rules 50, 59, and 60(b). The Court denied those motions by Memorandum and Order dated March 28, 2024.

34.    The Court's post-trial ruling did not adjudicate the truth or falsity of the alleged Rivera/Huot discovery agreement, did not make a finding that the alleged agreement existed, and did not decide whether that alleged agreement was used as part of a broader fraudulent scheme.

35.    During the February 13, 2023 trial colloquy, Judge Amon stated that she did not know whether Plaintiff counsel's asserted description of the alleged agreement was accurate and later stated that she did not know "who agreed on what."

36.     Later, in the post-trial context, the Court treated the certification/discovery issue as a Rule 403 trial-management issue that could confuse the jury, create prejudice, waste time, and implicate trial counsel as potential witnesses. That evidentiary treatment did not decide the merits of whether the alleged agreement existed or whether it was used as a mechanism of concealment.

37.     This action is based on a fuller record now available and on the allegation that the Underlying Action judgment was procured and preserved through a fraud affecting the integrity of the judicial process.

## DISCOVERY HISTORY AND THE ALLEGED UNPROVEN AGREEMENT

38.     On or about November 5, 2019, Defendants in the Underlying Action served discovery demands seeking medical and mental-health information and HIPAA authorizations.

39.     Ruderman and her counsel resisted providing any HIPAA authorizations and represented that Ruderman herself would obtain and produce responsive medical and mental-health records.

40.     Ruderman's counsel later claimed that the parties had reached an agreement limiting relevant medical records to records generated after Ruderman began her second period of employment with the Prakhin firm in June 2018, and that Ruderman-controlled production would satisfy the Prakhin Defendants' discovery needs.

41.     No signed stipulation, clear written agreement, court order, or on-the-record statement has been identified establishing that Defendants knowingly waived independent provider discovery, waived complete HIPAA authorizations, or agreed to accept partial Plaintiff-selected provider records as complete.

42.     Former defense counsel Edgar Rivera later directly controverted Plaintiff's

counsel's characterization of the alleged agreement in a sworn declaration. Plaintiffs allege that the alleged agreement was, at minimum, undocumented, unproven, directly controverted, and materially misleading.

43.     The newly discovered billing records do not corroborate the existence of the alleged discovery-limiting agreement. Plaintiffs allege that, despite numerous billing entries concerning medical-record review, discovery disputes, meet-and-confer work, HIPAA issues, record production, and communications with defense counsel, the billing records reviewed to date do not contain an entry expressly identifying Edgar Rivera, an agreement with Rivera, or negotiation, confirmation, or execution of any agreement limiting medical or mental-health discovery to records after June 2018.

44.     The absence of such billing evidence is material. If Ruderman's counsel had actually negotiated a discovery-limiting agreement that would replace independent HIPAA/provider discovery with Ruderman-controlled production and limit the scope of medical and psychiatric records, such an agreement would reasonably be expected to appear in contemporaneous time entries, correspondence, a signed stipulation, an on-the-record statement, or a clear written mutual confirmation.

45.     Plaintiffs allege that none has been identified, because the agreement is a fabrication.

46.     Nor does the alleged nine-page memorialization establish the claimed agreement. Plaintiffs allege that the alleged memorialization did not clearly state that Defendants agreed to limit medical or mental-health discovery to records beginning in June 2018, did not show a clear mutual waiver of independent provider discovery, and did not constitute a signed stipulation or court-ordered limitation.

47.     Plaintiffs further allege that the first clear assertion of the supposed June 2018 discovery limitation appeared only during trial, when the Court pressed counsel for an explanation of why certain Dr. Shostak records had not been exchanged. The timing, the absence of corroborating billing entries, the absence of a signed or clear written agreement, the absence of the claimed limitation from the alleged nine-page memorialization, the immediate objection by defense counsel, and Rivera's sworn declaration directly controverting Plaintiff counsel's version together constitute powerful evidence that the supposed agreement never existed and that the later assertion of such an agreement was false, fraudulent, and used as a post hoc justification for withholding material provider records.

48.     The alleged agreement was not a collateral attorney disagreement. It was the mechanism by which Ruderman and her counsel avoided independent provider discovery, retained unilateral control over the provider-record universe, and represented completeness to Defendants and the Court.

49.     Even if the alleged agreement had limited production to June 2018 forward, that would not excuse the withholding of the overwhelming majority of records from Dr. Pillai, Dr. Shostak, and Dr. Falk, many of which were from the relevant employment, disability, emotional-distress, and damages period.

50.     The Federal Rules permit discovery stipulations, but a party relying on a discovery-limiting stipulation must be able to prove it with reliable evidence, particularly when the alleged stipulation is invoked to avoid HIPAA authorizations and to substitute party-controlled production for independent third-party provider discovery. The absence of a reliable written or on-the-record agreement is probative of the fraudulent chain alleged herein.

## THE MAY 18, 2020 CERTIFICATION

51.     On February 13, 2023, during trial, the alleged discovery agreement surfaced in open court as Ruderman's counsel attempted to justify why certain Dr. Shostak records had not been produced. Counsel asserted that the issue had been "fully discussed," that the parties had "met and conferred," and that they had "agreed" to produce records only from the period when Ruderman began working for the Prakhin firm.

52.     Defense counsel immediately disputed that assertion. Counsel stated that Defendants had been asking for complete records for years and that the claimed limitation was "not true." Defense counsel further stated that no document had been produced proving such an agreement.

53.     Judge Amon did not adopt Ruderman's counsel's version. The Court stated: "How am I supposed to resolve this?" and observed that counsel were taking different positions on matters that should have been a record issue. The Court further stated that it had "no idea unless someone points to some record or discussion or something that answers this question."

54.     After Plaintiff's counsel again asserted that a prior agreement existed, Judge Amon asked who had met and conferred and what had been agreed. Plaintiff's counsel identified prior defense counsel and asserted that records would start when Ruderman began working for the firm. Defense counsel then read Judge Mann's April 30, 2020 order and Ruderman's May 18, 2020 certification, both of which used completeness language and did not contain a signed bilateral waiver of complete provider discovery.

55.     Judge Amon then stated that Plaintiff's counsel was asserting that "counsel agreed" on the date from which emotional-distress records would be searched, but immediately qualified that statement: "if that is an accurate description, and I don't know whether it is or not."

10

Defense counsel responded that it was not an accurate description and that Plaintiff had produced no records proving it.

56.     The Court later summarized the problem as one about what "all relevant records" meant and stated: "I don't know who agreed on what." The Court also stated that it had "no personal idea" whether Plaintiff counsel's claim that an agreement had been reached was accurate. Those statements confirm that the alleged agreement was not adjudicated, proven, or accepted by the Court.

57.     The same colloquy undermined the nonproduction explanation. When Judge Amon asked whether Plaintiff's counsel or Ruderman had access to Shostak records predating the produced records, Plaintiff's counsel first responded, "I don't know," then stated, "It's possible we do but that was not relevant for the production." The Court directed counsel to look for and produce any such records.

58.     Shortly thereafter, Plaintiff's counsel acknowledged that she had records predating the produced set, including January 2018 intake/new-patient materials and notes going forward, and stated that the records contained her handwriting, highlights, question marks, and notes. The Court ordered that all records predating the previously produced records be given to the Court and, where available without counsel notes, produced to Defendants.

59.     This trial colloquy is indicative of fraud and concealment because it shows that the alleged agreement was invoked only as a justification after the records issue became critical, was immediately disputed, was unsupported by a signed stipulation or clear written mutual assent, and was used to justify unilateral relevance determinations and nonproduction of provider records that Plaintiff counsel had reviewed and annotated.

60.     This issue was not merely an attorney disagreement. The alleged agreement was

one of the mechanisms of the concealment: it enabled Ruderman and her counsel to resist HIPAA authorizations, retain control over the provider-record universe, certify completeness, and later argue that unproduced records were outside the agreed scope. The February 13, 2023 transcript shows that the premise was unproven and directly controverted when finally presented in open court.

## PATTERN OF CONCEALMENT

61.    The production history demonstrates a repeated pattern across central providers. This was not isolated supplementation or inadvertent omission.

| Provider | Total | Timely exchanged | Late/dumped | Timely % |
|---|---|---|---|---|
| Dr. Cinthi Pillai | 121 pages | 8 pages | 113 pages | approx. 6.6% |
| Dr. Anna Shostak | 131 pages | 10 pages | 121 pages | approx. 7.6% |
| Dr. Martin Falk | 52 pages/materials | 2-page report | approx. 50 pages | approx. 3.8% |

62.    A separate no production problem exists for identified medical witnesses whose underlying provider files are not known to have been timely exchanged:

| Provider | Role/importance | Known timely provider records | Unproduced/missing file issue |
|---|---|---|---|
| Dr. Jeffrey G. Odel | Ophthalmology/genetic-testing/LHON narrative; planned/listed witness | 0 known provider records | Complete provider file, notes, referral/opinion records, counsel correspondence, and trial-prep records not produced |
| Dr. Vaidehi Dedania | Medical provider/witness identified in disclosures/JPTO | 0 known provider records | Underlying provider file not known to have been exchanged |
| Dr. Scott Brodie | Medical provider/witness identified in disclosures/JPTO | 0 known provider records | Underlying provider file not known to have been exchanged |
| Dr. Mark Moster | Medical provider/witness identified in disclosures/JPTO | 0 known provider records | Underlying provider file not known to have been exchanged |

63.    The zero-record entries are pleaded based on Plaintiffs' present knowledge and subject to discovery. They do not mean that Ruderman never possessed or that providers never created such records; they mean that no timely exchanged provider file is presently known for those listed medical witnesses despite their role in Ruderman's disability, treatment, and trial-testimony narrative.

64.    The above evinces intent. A party who timely produces most of a provider file and later supplements a small remainder may plausibly claim mistake. A party who timely

produces only 3.8% to 7.6% of multiple central provider files while certifying completeness creates an ineluctable inference of systematic concealment.

65.    The prejudice was insurmountable. By the time the concealed records were produced, Plaintiffs could not meaningfully retain mental-health, ophthalmological, vocational, or damages experts; conduct follow-up discovery; reopen Ruderman's deposition; conduct orderly provider depositions; seek Rule 35 relief; or present the jury with a coherent expert rebuttal.

## DR. CINTHI PILLAI

66.    Dr. Pillai is a neuro-ophthalmologist who treated Ruderman for her eye conditions.

67.    During discovery, Ruderman produced only eight pages of records from Dr. Cinthi Pillai, reflecting only two visit dates: November 20, 2018 and November 27, 2018.

68.    On February 1, 2023, only two business days before trial, Ruderman produced more than 100 additional pages of Dr. Pillai records from 2018. The newly produced records included additional treatment dates during the employment and disability period, including September 28, October 8, October 10, November 5, November 9, and November 13, 2018, as well as additional pages relating to the November 20 and November 27 visits.

69.    The late Pillai production was not duplicative or collateral. It revealed entire missing treatment dates from the core period when Ruderman claimed she was experiencing vision loss, treatment, disability-related limitations, and workplace issues.

70.    The late Pillai records were material to notice, disability, functional capacity, reasonable accommodation, causation, damages, and credibility.

71.    The Pillai production also exposed the misleading nature of the alleged discovery-

limiting agreement and the May 18, 2020 certification. If only eight of 121 pages were timely produced, then the production was not complete in any sense.

72. The limited HIPAA authorizations provided during the Underlying Action did not permit Defendants to independently obtain the missing 2018 Pillai records, because at least one such authorization was limited to records from May 18, 2020 to the present.

73. The late production deprived Plaintiffs of any meaningful opportunity to depose Dr. Pillai before trial, retain or consult an ophthalmology/low-vision expert, investigate the additional visits, or adjust trial strategy in a fair and orderly manner.

## DR. ANNA SHOSTAK

74. Dr. Anna Shostak was Ruderman's longtime psychiatrist and a central witness on emotional distress, psychiatric history, causation, medication, ADHD, anxiety, depression, and functional capacity.

75. Ruderman timely produced only 10 pages of a 131-page Shostak psychiatric record. The remaining 121 pages were produced only during trial, shortly before or at the time of Dr. Shostak's testimony.

76. 69. The withheld Shostak records showed years of preexisting psychiatric treatment, including purposefully concealed treatment for anxiety, depression, ADHD, medication management, and other mental-health conditions predating the LHON diagnosis and predating the termination of employment.

77. The records were material, because Ruderman claimed emotional-distress damages and presented a narrative that her psychiatric deterioration was caused by Plaintiffs' alleged discrimination and termination. The withheld records supplied alternative causation evidence and impeachment evidence.

78.     The Shostak records also bore directly on job performance and functional capacity. They included evidence concerning ADHD treatment and medication, including Adderall prescriptions and gaps in treatment during the period surrounding Ruderman's final weeks of employment.

79.     The delayed production prevented Plaintiffs from obtaining a psychiatric expert, conducting meaningful pretrial review, deposing Dr. Shostak in advance, obtaining relevant medical records, and preparing a comprehensive defense to emotional-distress causation based upon her extremely extensive pre-existing psychological issues.

80.     The late production of more than 90% of Dr. Shostak's psychiatric file during trial was not a harmless discovery issue. It deprived Plaintiffs of the ability to use the records in the way discovery is designed to permit: investigation, expert analysis, deposition, motion practice, and orderly trial preparation.

81.     Plaintiffs further allege that the timing of the Shostak production was part of the calculated sandbagging scheme alleged herein. Ruderman and her counsel had far greater time and opportunity to possess, review, annotate, decipher, and evaluate the Shostak records, while Plaintiffs received the bulk of those records only when trial was underway and when meaningful expert review, deposition preparation, Rule 35 relief, collateral subpoenas, and informed cross-examination were no longer realistically available. The purpose and effect of the late production was to create the appearance of compliance while depriving Plaintiffs and the Court of the practical ability to use the records for the truth-seeking function of trial.

### DR. MARTIN FALK

82.     Dr. Martin Falk was Ruderman's psychotherapist. During discovery, Ruderman produced only a two-page narrative letter or report from Dr. Falk, not his underlying treatment

notes.

83.     Dr. Falk later testified that Ruderman did not ask him for all his treatment records. Instead, she asked him for a report, which he prepared and handed to her.

84.     This testimony directly undermines the validity of Ruderman's certification that she had received and produced all relevant medical and emotional-distress records.

85.     The Falk notes contained material evidence concerning alternative sources of emotional distress, including relationship issues, family issues, panic symptoms, vision-related fears, employment concerns, medication issues, and post-termination life events.

86.     The Falk records also revealed that Ruderman's PTSD narrative was at least questionable, because the two-page Falk report reflected a diagnosis and narrative dependent on Ruderman's self-report and did not provide the kind of formal PTSD assessment or symptom analysis that a defense expert could have explored if the complete records had been timely disclosed.

**AFFIRMATIVE FALSE TRIAL NARRATIVE CONCERNING VISION, PSYCHIATRIC HISTORY, FUNCTIONAL CAPACITY, AND DAMAGES**

87.     Plaintiffs allege that the concealment scheme did not merely delay documents. It allowed Ruderman and her counsel to present a materially false and one-sided trial narrative through verdict. That narrative concerned four core issues: Ruderman's preexisting vision condition; her actual post-LHON functional limitations; her preexisting psychiatric and neurocognitive history; and the cause and extent of her claimed emotional-distress and wage-loss damages.

88.     As to vision, Ruderman testified that before mid-September 2018 her eyesight was fine, that she needed no assistance, glasses, or contact lenses, and that within months she

became legally blind.

89.     That testimony omitted that her left eye had longstanding dense amblyopia from childhood, that she was functionally monocular before LHON (blind in one eye), and that her treating eye records documented severe left-eye impairment. It also conflicted with post-trial-obtained deposition testimony in Kovalenko v. Ruderman, in which Ruderman admitted under oath that she could not see a photographic exhibit because of an eye condition.

90.     The Kovalenko admission is critical. In the Underlying Action, Ruderman and her counsel advanced the position that she could still perform the essential functions of a litigation attorney, including review of photographs, videos, handwritten records, maps, medical records, accident-scene depictions, and other visual exhibits. Yet in the separate Kovalenko proceeding, when shown a photograph, Ruderman admitted that she had difficulty seeing it, because of an eye condition. Plaintiffs allege that this admission, discovered after trial, directly contradicted the trial narrative and would have materially affected liability, front pay, back pay, and credibility.

91.     A post-trial expert report of Dr. Carolyn R. Carman, O.D., FAAO, explains that Ruderman had functional vision only in her right eye, because of longstanding dense amblyopia in the left eye; that her right-eye visual acuity declined to 20/150 on November 20, 2018 and later stabilized at 20/250; that LHON causes central scotoma, color deficits, and profound difficulty with central-detail tasks; and that accommodations such as magnification, text-to-speech, applications, and OrCam could not correct defects in central, peripheral, color, or detailed visual processing. Dr. Carman opines that Ruderman could not perform the essential functions of her job with or without accommodations, because completion of her required daily reading and visual tasks would have required approximately 13.6 to 19.35 hours per day.

92.     A post-trial report of Neva Fairchild, MS, an expert in blindness rehabilitation and

vocational functioning, reaches the same functional conclusion from a rehabilitation perspective. Fairchild explains that Ruderman's statement that her vision slowly deteriorated from normal vision was incomplete because she had significant left-eye amblyopia from early life and lacked binocular vision before LHON. Fairchild further explains that central vision loss would slow reading even with enlargement, prevent reliable perception of details in photographs and videos, impair face recognition and detailed exhibit review, and make handwritten medical records effectively impossible to decipher in the manner required of a personal-injury litigation attorney.

93.     These expert opinions matter, because Ruderman and her counsel presented the jury with a lay narrative that assistive devices and accommodations would have allowed her to perform the Prakhin attorney position. Without timely Pillai, Odel, Shostak, Falk, and related ophthalmological, psychiatric, and functional-capacity records, Plaintiffs were deprived of a fair opportunity to retain Dr. Carman, Fairchild, Dr. Geis, or comparable experts before trial. Plaintiffs do not presently allege a purposeful delay of all NYU, Wills Eye, or Columbia records; rather, Plaintiffs allege a supported late-production issue as to Dr. Pillai/NYU Neurology records, a zero-production issue as to Dr. Odel's provider file, and incomplete or absent provider-file issues as to other identified medical witnesses pending discovery. The resulting verdict was reached without the expert testimony necessary to translate the medical records and low-vision limitations into functional job-capacity opinions.

94.     As to psychological condition, Ruderman testified and caused her providers to report that her serious psychiatric symptoms began with LHON and her termination from employ with the defendant. She minimized prior anxiety as non-chronic, minimized or obscured her extensive psychiatric medication history, denied or minimized boyfriend and family stressors, and supported a PTSD narrative that attributed emotional injury to the termination. Plaintiffs

18

allege that these statements were materially false and misleading.

95.     The concealed and late-produced records show that Ruderman had a long preexisting psychiatric and neurocognitive history, including years of treatment for ADHD, anxiety, depression, low self-esteem, interpersonal stressors, obsessive-compulsive traits or symptoms, and neurocognitive limitations involving processing speed, attention, planning, organization, memory, and divided attention. These conditions predated LHON and the termination by many years and were directly relevant to causation, credibility, performance, damages, and the jury's emotional-distress award.

96.     Dr. Geis's forensic mental-health analysis explains that the record presented at trial omitted the broader psychiatric context. Dr. Geis identifies alternative contributing factors that the jury did not hear, including the psychological impact of Ruderman's eye disease and fear of blindness, chronic anxiety and depression, ADHD and neurocognitive weaknesses, relationship problems, family stressors, self-esteem issues, medication changes, and other life events. Dr. Geis also explains that the defense could not reasonably digest the late-arriving mental-health discovery in the time provided; he personally required approximately 13.5 hours, as a minimal estimate, to review, organize, and analyze the mental-health records for trial purposes.

97.     The concealment also corrupted the provider testimony. Dr. Falk's report and deposition were based on a history Ruderman supplied to him, but the late-produced records show that Ruderman failed to tell Falk her full psychiatric history, including prior diagnoses, medication, Shostak treatment since 2008, prior psychiatric care, neuropsychological testing, and alternative stressors. Falk's PTSD and causation opinions were therefore built on an incomplete and misleading history, and in fact was entirely predicated on falsehoods. Plaintiffs could not

expose that problem, because the Falk notes were dumped immediately before trial and the full Shostak record was not available until trial was underway.

98.    Plaintiffs allege that Ruderman's false testimony and omissions proceeded through trial and into verdict. Because the records and expert analysis necessary to rebut the narrative were withheld, delayed, or obscured, Ruderman's testimony was not meaningfully controverted on the issues most important to liability and damages. The verdict was therefore not merely influenced by late production; it was procured on a false evidentiary record created by a coordinated scheme of concealment, document dumping, provider-record control, and attorney amplification of the resulting false narrative.

99.    Plaintiffs further allege that counsel knowingly used the corrupted record in summation and trial argument. Ruderman's counsel argued that the evidence showed Ruderman could perform legal work as a personal-injury attorney, that assistive technology and accommodations could solve her job-performance limitations, and that her emotional distress and wage loss were caused by Plaintiffs' unlawful conduct. Those arguments would have been flatly contradicted by the withheld records, the post-trial expert opinions, and the Kovalenko admission.

100.    The direct misrepresentations and omissions were therefore not collateral. They went to the elements of Ruderman's claims, Plaintiffs' defenses, the amount of damages, and the jury's punitive-damages analysis. A verdict based on that concealed and uncorrected narrative undermines the integrity of the judicial process.

## REASONABLE DILIGENCE AND LATER DISCOVERY OF THE
## KOVALENKO/RUDERMAN ADMISSION

101.    Plaintiffs exercised reasonable diligence in attempting to identify publicly

available litigation involving Ruderman, including <u>Kovalenko v. Ruderman</u>. Plaintiffs allege, upon information and belief, that the deposition testimony containing Ruderman's admission that she could not see a photographic exhibit was not reasonably discoverable during the Underlying Action despite ordinary diligence.

102.    The significance of the Kovalenko/Ruderman admission became clear only when viewed together with the later-discovered provider records, expert reports, billing records, and Dr. Odel/Pillai substitution evidence showing that Ruderman's trial narrative concerning her vision, functional abilities, and claimed onset/progression was incomplete and misleading.

103.    Plaintiffs do not plead the Kovalenko/Ruderman testimony as an isolated impeachment item. Plaintiffs plead it as part of the newly discovered evidentiary matrix demonstrating that Ruderman's trial testimony regarding her visual condition and functional capacity was materially false or misleading and that Plaintiffs were prevented from presenting the expert and documentary proof necessary to expose it before verdict.

## DR. JEFFREY ODEL AND THE ODEL/PILLAI SUBSTITUTION

104.    The Joint Pretrial Order in the Underlying Action listed multiple medical witnesses for Ruderman, including Dr. Mark Moster, Dr. Scott Brodie, Dr. Cinthi Pillai, Dr. Vaidehi Dedania, Dr. Jeffrey G. Odel, and Dr. John Guy.

105.    The Joint Pretrial Order stated that these witnesses were expected to testify regarding Ruderman's medical condition, disability, treatments and procedures, and recovery, and that Plaintiff believed each would testify in person.

106.    Dr. Jeffrey G. Odel was therefore not a peripheral name. He was identified as an expected live medical witness on core issues.

107.    Ruderman later represented that Dr. Odel was unavailable and sought to substitute

Dr. Pillai as the testifying medical provider.

108.    Newly discovered time and billing records show that counsel had trial-related communications and work concerning Dr. Odel, including communications with Dr. Odel's office, obtaining or discussing HIPAA authority, preparing or reviewing correspondence to Dr. Odel, transmitting medical records, discussing Drs. Odel/Pillai records and trial strategy, and preparing correspondence to the Court concerning the substitution of Drs. Pillai/Odel.

109.    This chronology supports a reasonable inference that Ruderman and her counsel were actively managing medical-provider trial testimony while Plaintiffs lacked the full underlying provider record necessary to prepare a defense.

110.    The Odel/Pillai substitution is material, because it links the late Pillai production to broader trial strategy and demonstrates that the provider-record issue was not limited to one accidental omission.

111.    Unlike Pillai, Shostak, and Falk, where the present record permits a page-count comparison between timely and late production, Dr. Odel presents an additional and distinct concealment problem: Plaintiffs are aware of no production of Dr. Odel's provider file at all.

112.    The production of a Columbia genetic-test result, a record generated from testing ordered after an Odel referral, or an institutional record mentioning genetic testing did not constitute production of Dr. Odel's own provider file. It did not disclose Dr. Odel's notes, referral basis, impressions, opinions, office records, correspondence with counsel, communications with Ruderman, or trial-preparation materials.

113.    Plaintiffs allege that no legitimate justification permitted Ruderman and her counsel to identify or plan Dr. Odel as a medical witness concerning disability, treatment, and recovery while withholding the provider file necessary to prepare a defense with regard to that

testimony. If Defendants contend that no Odel records existed, Plaintiffs are entitled to discovery of that assertion, including subpoenas, HIPAA authorizations, correspondence, billing entries, communications, and custodian responses.

114.    Dr. Odel was part of the same ophthalmological/genetic-testing/LHON narrative, was tied to trial testimony and substitution strategy, and appears in the newly discovered billing chronology. The absence of his provider file supports the inference that the trial medical narrative was managed through selective disclosure and strategic substitution.

## DRS. DEDANIA, BRODIE, MOSTER, AND OTHER PROVIDERS

115.    The Joint Pretrial Order identified Dr. Dedania, Dr. Brodie, Dr. Moster, Dr. Odel, Dr. Pillai, and Dr. Guy as expected medical witnesses on Ruderman's medical condition, disability, treatment, procedures, and recovery.

116.    The breadth of that provider list demonstrates that Ruderman's medical condition, treatment history, and functional capacity were central to the trial.

117.    Upon information and belief, newly discovered billing records and trial-preparation materials identify provider contacts and records relating to Dr. Dedania, Dr. Brodie, Dr. Moster, and Dr. Odel that were not exchanged with Plaintiffs.

118.    Plaintiffs plead the Dedania/Brodie/Moster allegations cautiously pending discovery, but allege that the provider universe disclosed in the JPTO was materially broader than the records actually produced in time for meaningful defense use.

119.    Plaintiffs further allege that disclosure of a doctor's name in a pretrial order is not a substitute for production of that doctor's underlying provider file. A party cannot cure nonproduction of treatment records by listing the provider as a witness while depriving the adversary of the records required for investigation, expert review, deposition preparation, cross-

examination, and rebuttal.

120.    Upon information and belief, there was no valid basis to withhold provider records for Drs. Dedania, Brodie, Moster, or Odel if those providers were expected to testify, were consulted for trial, supplied information concerning Ruderman's claimed disability, or were part of the medical narrative presented to the Court and jury.

## MATERIALITY AND PREJUDICE

121.    The concealed and late-produced records were material to liability and damages.

122.    They bore on whether Ruderman was disabled within the meaning of the relevant statutes, whether Plaintiffs had notice, whether Ruderman could perform the essential functions of her position with or without accommodation, whether proposed accommodations would have been effective, and whether Plaintiffs' reasons for termination were legitimate and non-discriminatory.

123.    They also bore directly on emotional-distress damages, alternative causation, psychiatric history, preexisting conditions, medication, credibility, vocational capacity, and punitive damages.

124.    Plaintiffs' use of the late-produced and later-obtained records in trial and post-trial proceedings confirms their materiality. The Dr. Pillai records were the subject of Defendants' February 2, 2023 preclusion application, which argued that the late production consisted of more than 100 pages of 2018 records, added multiple previously undisclosed treatment dates, and would have affected deposition, expert, and trial strategy.

125.    The Shostak records and related handwritten notes were relied upon in post-trial Rule 50, 59, and 60 briefing to argue that Ruderman had a long preexisting psychiatric history, that she could not perform an essential function of reading handwritten records, and that the

withheld psychiatric file contradicted her trial narrative.

126.    The Falk materials were relied upon to argue that Ruderman and her counsel represented complete production while Falk later testified that Ruderman had requested only a narrative report, not his underlying treatment notes. Plaintiffs allege that the fact these records became central to trial and post-trial arguments confirms that they were material and should have been produced in time for meaningful expert review, discovery, and trial preparation.

127.    The records were not immaterial simply because Plaintiff's counsel later characterized some of them as pre-LHON or outside a fabricated agreement. Once discovered, they became central to the defense's Rule 50, 59, and 60 arguments, and they were used to show alternative causation and impeachment.

128.    The harm cannot be cured by saying the records were eventually produced. Discovery is valuable only when it permits investigation before trial. A document dump on the eve of trial or during trial cannot substitute for timely production when the records require expert review, deposition testimony, collateral subpoenas, and strategic preparation.

129.    The prejudice also includes the absence of Plaintiffs' now-identified experts. Dr. Carman would have explained to the jury, in medical and optometric terms, why Ruderman's central vision loss, monocular status, color limitations, and reduced reading speed made timely performance of essential personal-injury attorney tasks impossible even with accommodations. Neva Fairchild would have explained the same functional limitations from a blindness-rehabilitation and vocational perspective. Dr. Geis would have explained that the psychiatric record did not support the simplified causation narrative presented at trial and that the jury needed expert assistance to understand preexisting psychiatric conditions, neurocognitive limitations, alternative stressors, and the practical impossibility of analyzing the records during

trial.

130.    These experts were not absent because their testimony was unimportant. They were absent, because the record necessary to identify, retain, and prepare them was incomplete and strategically delayed. The withheld and late-produced records were the very materials needed to formulate the expert opinions that now expose the false trial narrative.

131.    The Kovalenko testimony is also material and prejudicial. It is a newly discovered sworn admission by Ruderman, obtained after trial, that she could not see a photographic exhibit, because of her eye condition. The admission, made on May 13, 2019, directly contradicts the position advanced in the Underlying Action, filed on May 20, 2019, that Ruderman could perform exhibit-intensive litigation work with reasonable accommodation. It also supports the opinions of Dr. Carman and Neva Fairchild that Ruderman could not reliably review photographs, videos, handwritten records, or other visual evidence essential to the Prakhin attorney position. Plaintiffs allege that the admission was made shortly before Ruderman commenced the Underlying Action against Prakhin and is material because Ruderman later obtained a jury award that included future pay for duties she claimed she could perform, including work requiring review of photographic and other visual exhibits.

132.    Plaintiffs further allege that Ruderman's false and misleading trial narrative materially affected not only liability and compensatory damages, but also the jury's punitive-damages determination. Ruderman presented herself as a previously healthy and fully capable litigation attorney whose sudden LHON diagnosis could have been accommodated through reasonable assistive technology, and whose loss of employment and emotional distress were caused by Plaintiffs' alleged misconduct. Plaintiffs allege that this narrative was materially false and misleading, because it concealed and minimized her preexisting monocular visual

limitations, longstanding psychiatric and neurocognitive history, actual functional inability to perform exhibit-intensive litigation tasks, and alternative causes of emotional distress. By depriving Plaintiffs of timely records and expert rebuttal, Defendants allowed that narrative to proceed to verdict largely uncontroverted, thereby creating a materially distorted basis for the jury's award of punitive damages.

133.    Newly discovered billing records further confirm the materiality and complexity of the withheld and late-produced medical-provider records. Ruderman's counsel billed at least approximately 60 hours in entries expressly involving medical records, HIPAA forms, provider-record review, record production, and provider-file analysis. When doctor-specific trial preparation, medical-provider witness preparation, Pillai/Odel substitution work, Falk/Shostak/Pillai preclusion disputes, and post-trial medical-record opposition work are included, the identifiable provider-record-related total exceeds approximately 100 hours. Plaintiffs allege that these billing records demonstrate that Ruderman and her counsel understood the provider records to be central to liability, damages, emotional-distress causation, trial testimony, expert strategy, and post-trial motion practice.

134.    Newly discovered billing records show that Ruderman's counsel had actual knowledge that handwritten medical-provider records were difficult and time-consuming to read, understand, and decipher.

135.    On November 14, 2019, counsel billed time reviewing medical records and conferring about "difficulty reading and understanding handwritten notes," and another timekeeper billed 3.7 hours analyzing medical records and attempting to decipher doctors' notes. On November 19, 2019, counsel billed time for a telephone call with a doctor to read over handwriting on medical records.

136.    On May 20, 2020, counsel again billed time concerning the legibility of records, attempting to read handwriting, deciphering records, and calling a doctor's office to decipher written notes.

137.    These entries demonstrate that Ruderman and her counsel knew the records were not the kind of materials that opposing counsel could fairly digest overnight during trial. They also knew that handwritten medical records were central to the very job-function issue in dispute, because Ruderman's ability to read handwritten medical records was an essential function of the Prakhin attorney position.

138.    The same counsel who spent substantial time deciphering and obtaining help reading doctors' handwriting later benefited from dumping handwritten provider notes on Plaintiffs at a time when Plaintiffs could not reasonably obtain comparable review, provider clarification, or expert analysis.

139.    These billing entries evince the intent to deceive and prejudice Plaintiffs' ability to defend the Underlying Action. Ruderman and her counsel knew, from their own review and billing history, that the provider records were technical, handwritten, difficult to interpret, and required careful attorney and expert analysis.

140.    Having themselves spent substantial time reviewing, annotating, interpreting, and strategizing around those records, Defendants knew or recklessly disregarded that Plaintiffs could not fairly review, decipher, investigate, subpoena collateral records, retain experts, prepare cross-examination, or present rebuttal expert testimony when the overwhelming majority of those records were dumped on the eve of trial or during trial.

141.    Plaintiffs allege that the timing was not accidental. The late productions occurred when the practical utility of the records to Plaintiffs had been severely diminished, while

Ruderman and her counsel had already had the opportunity to review, annotate, interpret, and incorporate the same provider materials into their trial strategy. That disparity in access, preparation, and expert

142.    opportunity is probative of fraudulent intent, material prejudice, and corruption of the adversarial process.

### PRIOR POST-TRIAL RULINGS DO NOT BAR THIS ACTION

143.    The Court's prior post-trial Memorandum and Order did not decide the merits of whether the alleged Rivera/Huot discovery agreement existed, whether it was accurately described, whether it was supported by a signed stipulation or clear written mutual assent, or whether it was used as part of a broader concealment scheme.

144.    The February 13, 2023 transcript instead shows that the issue was disputed in open court and that Judge Amon expressly stated that she did not know whether Plaintiff counsel's description was accurate or "who agreed on what."

145.    The Court also did not decide the full significance of the newly discovered time and billing records concerning Dr. Odel, Dr. Pillai, and provider trial preparation.

146.    The prior rulings were made on the record then presented. Plaintiffs now proceed on a materially fuller record, including the precise production percentages, provider-specific concealment pattern, Falk testimony, Odel/Pillai substitution evidence, and billing records.

147.    This action is not an appeal from the prior order and does not allege judicial misconduct. It alleges that the judgment was procured and preserved through fraud that deprived the Court of a truthful record.

148.    Because the Rivera-agreement issue was not actually decided, it is not subject to issue preclusion. To the extent Defendants assert claim preclusion, Plaintiffs allege that this

independent action is preserved by Rule 60(d) and is based on newly discovered evidence and fraud-on-the-court allegations not adjudicated on the merits in the prior post-trial decision.

## SUMMARY OF THE FRAUDULENT CONCEALMENT CHAIN

149. The foregoing facts do not represent isolated discovery mistakes. They form a connected chain of fraudulent concealment and litigation misconduct.

150. First, Ruderman placed her vision, psychiatric condition, emotional distress, functional capacity, employability, and damages directly at issue in the Underlying Action.

151. Second, Plaintiffs sought independent HIPAA authorizations and complete provider records, but Ruderman and her counsel resisted independent provider discovery and represented that Ruderman-controlled production would be complete.

152. Third, Plaintiff's counsel later invoked an alleged discovery agreement supposedly limiting the scope of medical and psychiatric records; however, that alleged agreement was fabricated, not documented by a signed stipulation, court order, or clear mutual writing, was not corroborated by the newly discovered billing records, was not clearly reflected in the alleged nine-page memorialization, first surfaced clearly only during trial when counsel was pressed by the Court, and was directly controverted by Rivera's sworn declaration.

153. Fourth, Ruderman certified under penalty of perjury that she had received and produced all medical records relating to her disability and emotional distress, while the later record showed that only small fractions of central provider files had been timely produced.

154. Fifth, the objective production ratios revealed systematic concealment: only approximately 6.6% of Pillai, 7.6% of Shostak, and 3.8% of Falk were timely produced, while the overwhelming majority was dumped on the eve of trial or during trial; in addition, Dr. Odel and other identified medical witnesses had no known timely exchanged provider files.

155.    The Shostak dump is a clear example of the scheme: the overwhelming majority of a central psychiatric file was withheld until trial, then produced under circumstances that made meaningful use impossible, thereby sandbagging both Plaintiffs and the Court.

156.    Sixth, the late-produced and later-discovered records contradicted Ruderman's trial narrative concerning her vision, psychiatric history, functional capacity, emotional distress, employability, and damages.

157.    Seventh, because the records were withheld until trial or discovered after judgment, Plaintiffs were deprived of the meaningful ability to retain and present expert testimony from Dr. Carman, Neva Fairchild, Dr. Geis, and other rebuttal witnesses, and were forced to cross-examine without the complete factual and expert record.

158.    Eighth, Ruderman's counsel had the time and opportunity to review, annotate, decipher, and strategize around the same provider records that Plaintiffs received only when meaningful expert review and trial preparation were no longer possible. This disparity in access and preparation further supports the inference that the late productions were calculated to prevent meaningful rebuttal while preserving Ruderman's false liability, damages, and punitive-damages narrative.

159.    Ninth, Ruderman's testimony and litigation narrative proceeded to verdict without the jury hearing the full contradictory medical, psychiatric, vocational, and functional-capacity evidence.

160.    Tenth, post-trial evidence, including provider-contact and billing records, the Dr. Odel/Pillai substitution evidence, expert opinions, and Ruderman's later Kovalenko/Ruderman admission, confirmed that the Underlying Action was tried on a materially incomplete and distorted record.

161.    Plaintiffs therefore allege that the verdict and judgment were not merely affected by ordinary discovery delay, but were procured through a coordinated course of concealment, misleading certifications, false or incomplete testimony, and attorney-managed suppression of material provider evidence that corrupted the truth-seeking function of the Court.

## COUNT I

**Independent Action for Relief from Judgment and Fraud on the Court**

**Fed. R. Civ. P. 60(d)(1), 60(d)(3), and Inherent Equitable Powers**

162.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

163.    Rule 60(d)(1) preserves this Court's power to entertain an independent action to relieve a party from a judgment. Rule 60(d)(3) preserves this Court's power to set aside a judgment for fraud on the court.

164.    Defendants engaged in a deliberate scheme to prevent Plaintiffs and the Court from receiving a full and fair record concerning Ruderman's medical, psychiatric, visual, functional, and damages evidence.

165.    The scheme included: invoking a fabricated discovery agreement directly controverted by sworn evidence and unsupported by contemporaneous billing records, a signed stipulation, a clear written mutual agreement, or the alleged nine-page memorialization; resisting HIPAA authorizations; maintaining Ruderman-controlled provider production; falsely certifying completeness; unilaterally deciding relevance; possessing and reviewing unproduced Shostak records with counsel notes and highlights; producing only small fractions of central provider files before trial; dumping the overwhelming majority of those records on the eve of trial or during trial; substituting Dr. Pillai for Dr. Odel while late-producing Pillai records; and presenting the case to the jury without giving Plaintiffs a fair opportunity to investigate and rebut

the full provider-record universe.

166.    Defendants' conduct involved officers of the Court and affected the integrity of the judicial process. It prevented the Court from managing discovery, trial evidence, and post-trial relief on a truthful and complete record.

167.    The misconduct was material, because the concealed records bore directly on liability, causation, emotional-distress damages, functional capacity, credibility, and punitive damages.

168.    The fraud was especially prejudicial, because it infected the jury's assessment of moral culpability. The jury was asked to punish Plaintiffs on a record that concealed or minimized Ruderman's preexisting visual, psychiatric, neurocognitive, and functional limitations, while presenting her as a previously healthy attorney who could have continued performing the job with reasonable accommodations.

169.    Plaintiffs exercised diligence. They repeatedly sought HIPAA authorizations and complete records, objected to incomplete productions, moved to preclude late records and testimony, sought trial relief, filed Rule 50/59/60 motions, and pursued post-trial remedies. The full scope of the fraud, including the newly discovered billing/provider-contact evidence and the precise concealment ratios, was not available in the same form during the Underlying Action.

170.    Absent equitable relief, Plaintiffs will suffer a grave miscarriage of justice, because a substantial federal judgment will remain in place despite being procured through material misrepresentations, concealment, and fraud affecting the judicial process.

171.    Plaintiffs are entitled to relief from the judgment in the Underlying Action, including vacatur or reopening, discovery into the fraud, and such further equitable relief as the Court deems just.

## COUNT II

### Common-Law Fraud and Fraudulent Concealment

### (Pleaded in the Alternative)

172.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

173.    Defendants made false statements and concealed material facts, including but not limited to: Ruderman's representations concerning her physical, visual, psychological, functional, and damages condition; representations that all relevant medical and mental-health records had been obtained and produced; representations concerning the existence and scope of an alleged discovery agreement; representations that Ruderman-controlled production satisfied discovery obligations; and representations minimizing the materiality of late-produced or withheld provider records.

174.    Those statements and omissions were material because they concerned central evidence in a disability-discrimination and emotional-distress trial.

175.    Defendants knew that the representations were false and misleading. Ruderman knew which providers she treated with and what records she had requested. Her counsel knew complete provider records had not been produced and that central records were being produced only on the eve of trial or during trial.

176.    Plaintiffs further allege that Defendants knew, from their own billing records and trial-preparation activity, that the medical and psychiatric records required substantial time to review, decipher, analyze, and translate into trial strategy. This knowledge makes the eve-of-trial and during-trial productions probative of intent, because Defendants knew Plaintiffs would not have comparable time to use those records meaningfully.

177.    Defendants intended that Plaintiffs and the Court rely on these representations and

omissions by accepting Ruderman-controlled production, foregoing or limiting HIPAA discovery, proceeding through trial without complete records, and treating the late productions as ordinary supplementation rather than as evidence of concealment.

178.    Plaintiffs and the Court did rely on those representations and omissions. Plaintiffs were deprived of timely records, expert review, depositions, follow-up subpoenas, Rule 35 remedies, and trial preparation.

179.    The Court was deprived of a complete record when ruling on discovery, trial, and post-trial issues.

180.    Plaintiffs suffered damages including the adverse judgment, litigation costs, attorney fees, expert fees, loss of trial opportunity, post-trial motion expenses, appeal-related expenses, and other damages to be proven at trial.

181.    To the extent the Court determines that some or all relief is not available solely through Rule 60(d), Plaintiffs plead common-law fraud and fraudulent concealment in the alternative.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for judgment as follows:

1.    A. Declaring that the judgment in the Underlying Action was procured and/or preserved through fraud, misrepresentation, concealment, or fraud on the Court;

2.    Vacating, setting aside, reopening, or granting relief from the judgment in the Underlying Action pursuant to Rule 60(d)(1), Rule 60(d)(3), and the Court's inherent equitable powers;

3.    Alternatively, ordering targeted discovery and an evidentiary hearing concerning the alleged fraud, including discovery into provider-record requests, HIPAA

authorizations, subpoenas, subpoena responses, Odel/Pillai substitution communications, billing records, and attorney-provider communications;

4. Awarding compensatory damages on the alternative common-law fraud and fraudulent concealment claim in an amount to be determined at trial;

5. Awarding punitive damages to the extent permitted by law;

6. Awarding attorney fees, costs, expert fees, and litigation expenses to the extent permitted by law or equity;

7. Granting pre-judgment and post-judgment interest where applicable; and

8. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: Brooklyn, New York
June 26, 2025

LAW OFFICE OF YURIY PRAKHIN, P. C.

JASON S. MATUSKIEWICZ, ESQ.
*Attorneys for Plaintiffs*
*LAW OFFICE OF YURIY PRAKHIN, P. C.*
*and YURIY PRAKHIN*
1883 86th Street, 2nd Floor
Brooklyn, New York 11214
(718) 946-5099